UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____
                                              )
WILLIAM T. CHASE                              )
1605 17th STREET, NE, #4                       )
WASHINGTON, DC 20020                          )
                                              )
ALDO CRUZ                                     )
3616 DEAN DRIVE, APT. J-2                     )
HYATTSVILLE, MD 20782                         )
                                              )
WILLIAM BROADIE                               )
5809 CHERRYWOOD TERRACE                       )
APT. 301                                      )
GREENBELT, MD 20770                           )
                                              )
RODNEY LEWIS                                  )
9409 PAUL DRIVE                               )
CLINTON, MD 20735                             )
                                              )
JOSEPH DOMINGUEZ                              )
900 MYERS COURT                               )
BRENTWOOD, CA 94513                           )
                                              )
LINDA HULSE                                   )
69 YELLOWBROOK ROAD                           )
FREEHOLD, NJ 07728                            )
                                              )
JOSEPH VADON,                                 )
69 YELLOWBROOK ROAD                           )
FREEHOLD, NJ 07728                            )
                                              )
VICTOR MORENO                                 )
819 PIEDMONT LANE                             )
DALTON, GA 30721                              )
                                              )
ROGER DALY                                    )      CA No. 1:03-CV-01683 (JR)
1024 ROYAL OAKS DRIVE                         )
APARTMENT #320                                )   **FIRST AMENDED CLASS ACTION**
MONROVIA, CA 91016                            ) **AND COLLECTIVE ACTION COMPLAINT**
                                              )
**Individually And**                          )
**On Behalf of all Other Persons**            )      **JURY TRIAL DEMANDED**
**Similarly Situated,**                       )
                            Plaintiffs,       )
          v.                                  )
                                              )
AIMCO PROPERTIES, L.P.;                       )
NHP MANAGEMENT, INC.                          )
Defendant.                                    )
_____)

## SUMMARY OF ALLEGATIONS

1.    Defendants AIMCO Properties, L.P. ("AIMCO") and NHP Management, Inc. ("NHP") (collectively, "Defendants"), beginning in at least the year 1999 and continuing until the present, have willfully violated federal law and applicable state laws by refusing to pay Plaintiffs William Chase; Aldo Cruz; William Broadie; Rodney Lewis, Joseph Dominguez; Linda Hulse; Joseph Vadon, Roger Daly and Victor Moreno, as well as everyone else employed by Defendants as hourly-paid "Service Technicians"; "Maintenance Supervisors" and "Service Managers," for all of the hours they work, and by refusing to pay overtime for all hours worked over 40 per week.

2.    This denial of legally required overtime pay has been accomplished through two separate practices, implemented nationwide.

3.    The first practice is AIMCO's requirement that employees who work overtime take off "compensatory time" on future scheduled workdays rather than be paid overtime. AIMCO implemented this compensatory-time off policy while simultaneously setting staffing levels at its apartment communities at such low levels that, as a practical matter, employees are wholly unable to take off the "compensatory time" that they are owed. The predictable – and intended – result is that AIMCO's Service Technicians, Maintenance Supervisors, and Service Managers are not paid overtime compensation when they work more than 40 hours a week, and never receive their compensatory time either.

4.    The second practice is AIMCO's refusal to pay employees who are "on call" at its apartment communities for the time they spend waiting for calls. These employees must be available 24 hours a day to respond to emergency requests for services from tenants, and must arrive at tenants' apartment between 5 and 20 minutes of tenants' requests for service. In many cases these employees' lives are severely restricted while they are on call. Yet AIMCO does not pay its employees for this waiting time.

5.      Both of these practices are knowing, willful, and intentional violations of The Fair Labor Standards Act, 29 U.S.C. §§ 207 *et seq.* ("FLSA"); D.C. Code 32 § 1003 (2003); Md. Code & Ann., Lab. & Empl. § 3-415 (2003); 8 CCR § 11070.2(A)(1); CA Labor Code § 510 (2003); and the CA Business and Professions Code § 17-200 (2003).

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Claims For Relief I & V, seeking relief for violations of the FLSA, pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).  This Court has jurisdiction over Claims for Relief  II, III, IV, & VI, seeking relief for violations of the laws of the District of Columbia, Maryland, and California, pursuant to 29 U.S.C. § 1292(b) (supplemental jurisdiction).

7.      Defendants regularly transact business in this District and are therefore subject to personal jurisdiction here.

8.      AIMCO and/or NHP own and operate approximately seven apartment complexes in this District, including the apartment complex where Plaintiffs Chase and Moreno were employed.

9.      NHP and/or AIMCO also manage apartment communities and employ employees in this District.  NHP was an employer of both Plaintiff Chase and Plaintiff Moreno in this District.

10.      Upon information and belief, AIMCO was a joint employer, with NHP, of Plaintiffs Chase and Moreno in this District.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(c), because both AIMCO and NHP are subject to personal jurisdiction in this District.    In addition, Plaintiffs Chase and Moreno were employed at a facility owned and operated by AIMCO and/or NHP in this district, and were employed by NHP and AIMCO in this district, such that the unlawful acts of which Plaintiffs Chase and Moreno complain took place in this District.

12.      AIMCO is engaged in interstate commerce, as it owns, operates and manages apartment facilities, and employs employees, in Washington, D.C., 47 states, and Puerto Rico.

3

13.    NHP is engaged in interstate commerce, as it owns, operates and manages apartment facilities, and employs employees, in Washington, D.C., 47 states, and Puerto Rico.

## THE PARTIES

14.    Defendant AIMCO is the largest owner and operator of apartment properties in the United States.  It has its principal place of business in Denver, Colorado, but owns, operates or manages approximately 1,788 properties containing approximately 318,152 apartment units located in the 47 states, the District of Columbia, and Puerto Rico.   AIMCO currently owns, operates, and manages 7 apartment communities in the District of Columbia, although it has operated as many as 11 properties in the District of Columbia during the Class Period.

15.    Upon information and belief, AIMCO is a joint employer with NHP of many employees at AIMCO's apartment communities, including the named plaintiffs in this action.

16.    Defendant NHP is an apartment management company with its principal place of business in Denver, Colorado.  NHP owns, operates or manages approximately 1,788 properties containing approximately 318,152 apartment units located in the 47 states, the District of Columbia, and Puerto Rico.

17.    NHP is an employer of many employees at   AIMCO apartment communities, including the Plaintiffs.

18.    Plaintiffs and the members of the putative class and subclasses, as set forth below, all are current or former employees of AIMCO and NHP who are or were employed as hourly-paid "Service Technicians" or "Maintenance Supervisors" or "Service Managers," or in other job titles performing similar job duties.  Plaintiffs' job responsibilities included maintaining the condition of the apartment community at which they are or were employed and responding to tenant requests for services.

19.    Plaintiffs are or were required periodically to remain "on call" on a 24-hour a day basis to respond to emergency requests for assistance or services from tenants.

20.    Plaintiff William Chase was an hourly-paid Maintenance Technician who worked at a property called the "Fairmont I & II," located in Washington, D.C.  from approximately April 12, 1999 until approximately August 14, 2000.

21.    Plaintiff Victor Moreno was an hourly-paid Service Technician who worked at the Fairmont I & II in Washington, D.C. from 1996 until 2001.

22.    Plaintiff Aldo Cruz was an hourly-paid Service Technician who worked  at a property called the "Spring Hill Lake" property located outside the Washington, D.C. beltway in Greenbelt, Maryland from August 8, 2000 until May 30, 2003.

23.    Plaintiff William Broadie is employed by AIMCO at the Spring Hill Lake property in Greenbelt, Maryland.  Plaintiff Broadie began work as an hourly paid Service Technician on approximately June 28, 1999, was promoted to a salaried management position within AIMCO in late 2003, and is currently employed by AIMCO.

24.    Plaintiff Rodney Lewis was an hourly-paid Service Technician who worked at the Spring Hill Lake property in Greenbelt, Maryland from approximately May 31, 2002 until approximately October 12, 2003.

25.    Plaintiff Joseph Dominguez was an hourly-paid Service Technician who worked for AIMCO at the "Runaway Bay" property in Antioch, California, located about forty miles outside of San Francisco, from approximately November of 1993 until approximately December 14, 2001.

26.    Plaintiff Linda Hulse was an hourly-paid Maintenance Supervisor for AIMCO who worked at an AIMCO facility in Plainsboro, New Jersey.  Plaintiff Hulse was paid on an hourly basis until February of 2001, when she was promoted to a salaried management position.  Plaintiff Hulse left AIMCO in approximately April 20, 2003.

27.    Plaintiff Joseph Vadon was an hourly-paid Service Technician who worked at an AIMCO facility in Plainsboro, New Jersey from approximately November 30, 1999 until approximately April 1, 2003.

5

28.    Plaintiff Roger Daly was an hourly-paid Service Technician and Maintenance Supervisor who worked at the following AIMCO facilities: the Villa Serena property in Chino, CA, at which he was a Service Technician; the Seasons of Chino property, also in Chino, CA, at which he was a Maintenance Supervisor; the Heritage Park property in Alta Loma, CA, at which he was a Maintenance Supervisor; and the Heritage Park property in Rialto, CA, at which he was a Maintenance Supervisor. Plaintiff Daly was employed by AIMCO from approximately January of 1999 until approximately December of 2002.

## THE CLASS AND SUBCLASSES

29.    This action is brought as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of Plaintiffs and all other persons who are or have been employed by AIMCO anywhere in the United States as either hourly-paid Service Technicians, Maintenance Supervisors, or Service Managers, or individuals having similar job responsibilities but varying titles (hereinafter the "Class"), between August 7, 2000 and the date of the final disposition of this action (hereinafter the "Class Period").

30.    In addition, the Plaintiffs seek protection under the wage laws of the states in which they are or were employed. Accordingly, they seek to pursue class claims pursuant to Fed. R. Civ. P. 23 in the following manner:

(a)    Plaintiff Chase and Moreno seek to represent themselves and all persons similarly situated who are or were employed on an hourly basis by AIMCO in the District of Columbia as Service Technicians, Maintenance Supervisors or Service Managers since August 7, 2000 (hereinafter the "DC subclass");

(b)    Plaintiffs Daly and Dominguez seek to represent themselves and all persons similarly situated who are or were employed on an hourly basis by AIMCO in California as Service Technicians, Maintenance Supervisors or Service Managers since August 7, 1999 (hereinafter the "California subclass"); and

6

(c) Plaintiffs Cruz, Broadie, and Lewis seek to represent themselves and all persons similarly situated who are or were employed on an hourly basis by AIMCO in Maryland as Service Technicians, Maintenance Supervisors, or Service Managers since August 7, 2000 (hereinafter the "Maryland subclass").

Collectively, these subclass claims will be referred to as the "state law subclasses."

## ALLEGATIONS OF THE PLAINTIFFS AND THE CLASS

### Defendants' Failure To Pay For Time Spent Responding To Emergency Service Calls

31.    Defendants jointly own, operate and manage apartment communities across the United States.  Indeed, Defendants are the largest owners, operators, and managers of apartment communities in the country, owning, operating and/or managing over 1700 properties nationwide.

32.    Many of AIMCO's properties are managed by NHP, and many of the employees who work at these AIMCO properties also are employees of NHP.

33.    AIMCO and NHP employ hourly-paid individuals at their apartment communities with the job titles Service Technician, Maintenance Supervisor, and Service Director (collectively, "Service Personnel").

34.    The job duties of Maintenance Personnel include, among other things, maintaining the condition of their apartment communities and performing scheduled and unscheduled maintenance and repair work at their facilities.  These duties include tasks such as repairing broken appliances, fixing air conditioning units, fixing plumbing problems, and performing electrical work. Maintenance Personnel also must prepare vacant apartments to be rented, and some are responsible for maintaining adequate stocks of supplies and dealing with contractors and outside workers.

35.    In addition to the above job duties, on a rotating basis Maintenance Personnel are required to remain "on call," defined as being accessible to respond immediately to emergency requests for services from tenants, and available to arrive at tenants' apartments within 20 minutes or less in response to such requests.

7

36.    Maintenance Personnel usually are on call for one-week periods occurring once or twice each month, during which they work between approximately 4 p.m. and 8 a.m Monday through Friday, and 24 hours a day over the weekends.

37.    Defendants guarantee prompt service to their tenants who live in their communities, and rely upon their Maintenance Personnel to fulfill those guarantees.

38.    In order to fulfill their guarantee of prompt service, the Defendants require that, in response to request for emergency service made by tenants, employees who are on call must arrive at the tenant's apartment to provide the requested assistance within 20 minutes or less of when the tenant's call is received.

39.    Defendants also guarantee that, under most circumstances, other tenant needs will be addressed within 24 hours of the time the Defendants are notified of the problem. Failure to provide the services guaranteed will usually afford the tenant a discount on future rent payments. This service guarantee is prominently advertised on the AIMCO website.

40.    Beginning in the year 2000, or earlier, and continuing to the present, the Defendants have followed a policy of generally denying payment of overtime wages to its Maintenance Personnel for time spent on call at their facilities and for time spent responding to emergency service requests from tenants. This policy is hereinafter identified as the "No-Overtime Policy."

41.    The No-Overtime Policy has been communicated by the Defendants to managers at all of its residential communities, and was documented in countless electronic mail messages from upper management to managers at the residential communities.

42.    The No-Overtime Policy only permits payment of overtime wages only when the overtime work is approved by a Regional Vice President ("RVP") or higher before the overtime work is performed. Throughout the liability period, the Defendants have employed only about 14 RVP's in the United States at any one time.

43.     In lieu of paying overtime wages, the No-Overtime Policy directs Community Managers to offer "compensatory time" to Maintenance Personnel who work more than 40 hours per week

44.     "Compensatory time" is time off from work during working hours.  In order to qualify as a lawful alternative to the payment of overtime wages, management must allow employees who earned overtime to use their compensatory time within the same work week as the overtime was performed.  The sole exception is California, where, because state wage law requires payment at overtime rates for work in excess of 8 hours in one day, compensatory time is illegal under all circumstances.

45.     The Defendants, however, knowingly and willfully set staffing levels so low that Maintenance Personnel who work more than 40 hours per week have been precluded by their workloads from actually using the compensatory time they have earned.

46.     These low staffing levels have been caused by several policies employed by the Defendants.

47.     First, throughout the liability period, the defendants have imposed a staffing requirement that permits, at most, only one Maintenance Person to be assigned to its apartment communities for every 100 apartments at the community.  This policy is enforced in such a way that, for example, if an apartment community has 280 apartments, it is still only assigned, at most, two Maintenance Persons rather than three.  In addition, many AIMCO facilities are staffed more leanly, resulting in even greater pressure on the Maintenance Personnel.

48.     Second, beginning in approximately the year 2000, the Defendants required that each apartment community be staffed "5% out of the box" at all times.  This policy meant that apartment communities would be provided with 5% less staff than was typically employed by other apartment management companies.

9

49.    Third, in approximately 2001, the Defendants adopted an initiative called "Project Century," pursuant to which thousands of their employees were laid off, including most of the grounds keeping and housekeeping staffs.

50.    Each of these staffing policies separately, as well as taken together, caused the remaining apartment community staff to be very busy at all times, and deprived them of any flexibility in the schedules in which they worked.

51.    Despite these diminished staffing levels and the enhanced workloads they imposed on Maintenance Personnel, the Defendants insisted that when Maintenance Personnel performed overtime work, they receive compensatory time rather than be paid overtime wages.

52.    The Defendants were informed repeatedly by Community Managers and Maintenance Supervisors across the country, during both regional meetings attended by RVPs and on other occasions, that Maintenance Personnel lacked the time to use the compensatory time they earned due to large and inflexible work loads.

53.    Notwithstanding repeated notice that Maintenance Personnel who performed overtime work were unable to use the compensatory time offered in lieu of overtime wages, the Defendants persisted in requiring advance approval before overtime wages were paid and directing managers to require that employees be provided compensatory time in lieu of overtime wages.

54.    In addition, in an effort to conceal the amount of overtime work performed, managers employed by the Defendants have directed Maintenance Personnel to record on their time sheets less time than they actually worked, and have altered time sheets completed by Maintenance Personnel to reduce the number of hours worked that are recorded.

55.    The compensation policies and practices set forth above constitute a willful, knowing, and intentional violation of the Fair Labor Standards Act, as well as of the laws of the states of California, Maryland, New Jersey and the District of Columbia.

56.    The compensation policies and practices also provided Defendants with an unfair business and competitive advantage over other similar businesses in the state of California.

10

**Defendants' Failure To Pay For Time Spent Waiting For Emergency Service Calls**

57.     The Defendants require that at least one member of the Maintenance Personnel staff at each apartment community remain available to respond to emergency service requests during all hours when the apartment community office is closed and no Maintenance Personnel are on regularly-scheduled duty.  The employee who remains available pursuant to this requirement is said to be "on call."

58.     On call service usually extends from 4 p.m. until 8 a.m. Monday through Friday, and during the entire weekend.

59.     While serving on-call, Maintenance Personnel are required to be available to immediately respond to emergency service requests from tenants.  As a result, while Maintenance Personnel serve on call they are typically required to carry a beeper or cellular phone.

60.     Tenants are provided a telephone number that they may call in order to reach the Maintenance Person serving on call at any time of the day or night.  Typically tenants either call an answering service that pages the Maintenance Person on call or call directly to the pager or cellular phone carried by the Maintenance Person on call.

61.     The Defendants require that Maintenance Personnel on call be available to arrive at the apartment of any tenant reporting a problem qualifying as an emergency, such as a leak or lockout, within a short, fixed amount of time after the call is received, which is typically less than 20 minutes and sometimes as little as 5 to 10 minutes.

62.     In larger apartment communities, Maintenance Personnel on call usually receive three to five emergency service requests from tenants each night, and more calls on weekends and during seasons when tenants use heating and cooling systems heavily.

63.     In some smaller apartment communities, Maintenance Personnel receive calls less frequently, but most employees still receive at least 5 to 10 emergency service calls each week during which they are on call.

64.    The time required to address tenant emergency service requests ranges in length from about 20 to 30 minutes for emergencies that can be readily addressed, such as lockouts, to eight to ten hours if the service need is onerous or requires substantial repairs, such as a major leak.

65.    As a result of the Defendants' requirement that Maintenance Personnel respond so promptly to emergency service requests while they are on call, the Maintenance Personnel are severely limited in their ability to pursue activities unrelated to their employment while they are on call.

66.    For example, while on call Maintenance Personnel often cannot care for their children unassisted, cannot attend religious services, cannot go out to dinner, cannot engage in shopping, cannot attend movies or plays, and cannot visit their families.

67.    While on call, Maintenance Personnel are often unable to sleep throughout the night. Many Maintenance Personnel receive less than 5 hours of sleep at night while on call.

68.    Maintenance Personnel are subject to discipline, up to and including termination, for failing to respond promptly to emergency service requests lodged while they are on call.

69.    The severe restrictions imposed on the personal lives and activities of Maintenance Personnel when they are on call mean that, while they serve on call, the Defendants effectively have engaged Maintenance Personnel to wait for emergency service calls from tenants. Accordingly, the Defendants should have paid the Maintenance Personnel their hourly rate, or time and a half their hourly rate for overtime hours, for all time spent on call.

70.    The Defendants have been fully aware that service on call places severe restrictions on the personal lives of their Maintenance Personnel. The Defendants are aware of the prompt response times that they have required of their Maintenance Personnel and track the number of emergency requests received from tenants at each property, as well as the time spent responding to those requests.

71.    The time expended by Maintenance Personnel on call has been for the benefit of the Defendants, as have been the restrictions on personal activities to which Maintenance Personnel were subjected while on call.

72.    Nonetheless the Defendants have maintained a corporate policy, which has been implemented throughout all of their apartment communities across the country, of declining to pay Maintenance Personnel for the time they spend on call waiting to receive emergency service requests.

73.    This compensation policy and practice constitutes a knowing, intentional, and willful violation of the Fair Labor Standards Act and of the laws of the states of California, Maryland, New Jersey, and the District of Columbia.

74.    This compensation policy and practice also provided Defendants with an unfair business and competitive advantage over other similar businesses in the state of California.

## COLLECTIVE ACTION ALLEGATIONS

75.    The collective action that the Plaintiffs propose to maintain encompasses all individuals who work or worked as hourly-paid Service Technicians, Maintenance Supervisors or Service Managers, or in hourly-paid jobs having similar on call responsibilities regardless of the job title, at any facility owned, operated or managed by the Defendants in the United States between August 7, 2000 and the time of the final disposition of this action (the "Class Period").

76.    Persons who elect to participate in the proposed collective action will be represented by all of the Plaintiffs named in this complaint.

77.    During the Class Period, the duties and responsibilities of the jobs held by members of the proposed collective action were the same as or substantially similar to the duties and responsibilities of the jobs held by the Plaintiffs.

78.    Plaintiffs and the members of the proposed collective action are and were subject to one or both of the unlawful compensation policies and practices set forth in paragraphs 31 through 74, *supra* .

13

79.    Accordingly, the Plaintiffs and all of the members of the proposed collective action are "similarly-situated" within the meaning prescribed by 29 U.S.C. § 216(b).

## WASHINGTON, D.C. SUBCLASS ALLEGATIONS

80.    In addition to qualifying as a collective action maintained pursuant to the FLSA, this action is brought on behalf of members of three subclasses, each arising under a different state wage and hour law.  They will be identified as the "D.C. Subclass," the "California Subclass," and the "Maryland Subclass."

81.    The "D.C. Subclass" that the Plaintiffs propose to maintain encompasses all individuals who work or worked as hourly-paid Service Technicians, Maintenance Supervisors or Service Managers, or in hourly-paid jobs having similar on call responsibilities regardless of the job title, at any facility owned, operated or managed by the Defendants in the District of Columbia at any time from August 7, 2000 until the final disposition of this action (hereinafter, the "D.C. Subclass Period").

82.    The D.C. Subclass is represented by Plaintiffs William Chase and Victor Moreno.

83.    During the D.C. Subclass Period, the duties and responsibilities of the jobs held by members of the proposed D.C. Subclass were the same as or substantially similar to the duties and responsibilities of the jobs held by Plaintiffs Chase and Moreno.

84.    Plaintiffs Chase and Moreno and the members of the D.C. Subclass are and were subject to one or both of the unlawful compensation policies and practices set forth in detail in paragraphs 31 through 74, *supra* .

85.    Plaintiffs Chase and Moreno and the members of the D.C. Subclass are thus "similarly-situated" within the meaning prescribed by D.C. Code 32 § 1003 (2003).

## MARYLAND AND CALIFORNIA SUBCLASS ALLEGATIONS

86.    The "California Subclass" that the Plaintiffs propose to maintain encompasses all individuals who work or worked as hourly-paid Service Technicians, Maintenance Supervisors or

Service Managers, or in hourly-paid jobs having similar on call responsibilities regardless of the job title, at any facility owned, operated or managed by the Defendants in the state of California at any time from August 7, 1999 until the final disposition of this action (hereinafter the "California Subclass Period").

87.     The California Subclass is represented by Plaintiffs Dominguez and Daly.

88.     The Maryland Subclass that the Plaintiffs propose to maintain encompasses all individuals who work or worked as hourly-paid Service Technicians, Maintenance Supervisors or Service Managers, or in hourly-paid jobs having similar on call responsibilities regardless of the job title, at any facility owned, operated or managed by the Defendants in the state of Maryland at any time from August 7, 2000 until the final disposition of this action (hereinafter the "Maryland Subclass Period").

89.     The Maryland Subclass is represented by Plaintiffs Cruz, Broadie, and Lewis.

90.     The duties and responsibilities of the jobs held by members of the proposed California and Maryland Subclasses were the same as or substantially similar to the duties and responsibilities of the hourly-paid jobs held by Plaintiffs Daly, Dominguez, Cruz, Broadie, and Lewis.

91.     Plaintiffs Daly, Dominguez, Cruz, Broadie, and Lewis and the members of the California and Maryland subclasses are and were subject to one or both of the unlawful compensation policies and practices set forth in detail in paragraphs 31 through 74, *supra* .

92.     Upon information and belief, the members of the California and Maryland subclasses are so numerous that joinder of the members of each subclass would be impracticable. Based upon the number of facilities that the Defendants own, operate or manage in California and Maryland, and the number of Maintenance Personnel employed at each facility, there are at least 50 members of each subclass. Joinder of these individuals would be impracticable.

93.     The claims of Plaintiffs Broadie, Cruz, Daly, Dominguez, and Lewis are typical of the claims of the members of the California and Maryland subclasses. Plaintiffs Broadie, Cruz,

Daly, Dominguez, and Lewis and the members of the California and Maryland subclasses had or have the same or substantially similar job responsibilities and duties, and were subject to one or more of the unlawful compensation policies and practices set forth in detail at paragraphs 31 through 74, *supra.*

94.    Plaintiffs Broadie, Cruz, Daly, Dominguez, and Lewis and the members of the California and Maryland subclasses all challenge the legality of the policies and practices set forth in detail at paragraphs 31 through 74, *supra.*  Therefore, by advancing their own claims, Plaintiffs Broadie, Cruz, Daly, Dominguez, and Lewis will necessarily advance the claims of the members of the California and Maryland subclasses.

95.    There are questions of fact and law common to the claims of the California and Maryland subclasses, including but not limited to the overriding questions of:

(A)    the nature of the job duties, requirements, and responsibilities of the members of the two subclasses while on call;

(B)    Whether the policies and practices set forth in paragraphs 31 through 74, *supra*, took place as alleged; and

(C)    the legality, under the laws of California and Maryland of the policies and practices set forth in paragraphs 31 through 74 *supra.*

96.    Plaintiffs Daly and Dominguez will adequately represent the interests of the California Subclass and Plaintiffs Cruz, Broadie, and Lewis will adequately represent the interests of the Maryland Subclass.

97.    Plaintiffs Broadie, Cruz, Daly, Dominguez, and Lewis have no interests adverse to any member of the California Subclass or the Maryland Subclass.

98.    Plaintiffs have retained counsel experienced in class and collective action employment litigation who will adequately represent the Maryland and California subclasses.

99.    Questions of fact and law common to the Maryland and California subclasses will predominate over individual questions, if any, that apply to individual members of the Maryland and California Subclasses.

100.    Because Plaintiffs Broadie, Cruz, Daly, Dominguez, and Lewis and all members of the California and Maryland Subclasses had the same or substantially similar job duties and responsibilities, and challenge the same unlawful compensation policies and practices set forth in detail in paragraphs 31 through 74, *supra*, a class action is superior to alternate methods, if any, of resolving this dispute.

## CLAIMS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

I.    Determine the damages sustained by the Plaintiffs and the members of the Class during the Class Period as a result of the Defendants' willful and intentional violations of 29 U.S.C. § 207(a), and award such back pay against AIMCO and in favor of Plaintiffs and all members of the Class, plus an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b), plus such pre-judgment interest as may be allowed by law;

II.    Determine the earnings lost by Plaintiffs Chase, Moreno, and the members of the DC Subclass during the D.C. Subclass Period as a result of the Defendants' willful and intentional violations of D.C. Code 32 § 1003 (2003), and award all appropriate and statutory damages and penalties resultant therefrom to Plaintiffs Chase, Moreno, and the members of the DC Subclass.

III.    Determine the damages sustained by Plaintiffs Cruz, Broadie, and Lewis and the members of the Maryland Subclass during the Maryland Subclass Period as a result of AIMCO's willful and intentional violations of Md. Code & Ann., Lab. & Empl. § 3-415 (2003), and award all appropriate and statutory damages and penalties

17

resultant therefrom to Plaintiffs Cruz, Broadie & Lewis and the members of the Maryland Subclass.

IV.     Determine the damages sustained by Plaintiff Daly, Dominguez and the members of the California Subclass during the California Subclass Period as a result of AIMCO's willful and intentional violations of 8 CCR § 11070.2(A)(1); CA Labor Code § 510 (2003); and  CA Business and Professions Code § 17-200 (2003), and award all appropriate and statutory damages and penalties resultant therefrom to Plaintiff Daly, Dominguez and the members of the California Subclass; and

V.      Award Plaintiffs and the members of the Class and the D.C., Maryland, and California subclasses their costs and disbursements of this suit, including, without limitation, reasonable attorneys', accountants', investigators', and experts' fees; and

VI.     Grant Plaintiffs and the members of the Class and the D.C., Maryland and California subclasses such other and further relief, including, without limitation, injunctive relief where appropriate, as the Court may deem just and proper or that is allowed under any Federal or state law violated by the Defendants' conduct described herein.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Submitted by the attorneys for the Plaintiffs, the Class, and the D.C., California, and Maryland Subclasses,

Stephen M. Pavsner
Jay P. Holland
JOSEPH, GREENWALD
& LAAKE, P.A.                    -and-
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Tel.: (301) 220-2200
Fax: (301) 220-1214

Joseph M. Sellers (D.C. Bar No.  318410)
Charles E. Tompkins  (D.C. Bar No. 459854)
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower - Suite 500
Washington, D.C.  20005
Tel.: (202) 408-4600
Fax:  (202) 408-4699

Dated: March 5, 2004

18