**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WILLIAM T. CHASE, *et al.*,          :
                                     :
          Plaintiffs,                :
                                     :
     v.                              :  Civil Action No. 03-1683 (JR)
                                     :
AIMCO PROPERTIES, L.P.,              :
                                     :
          Defendant.                 :

**MEMORANDUM ORDER**

          Plaintiffs, nine individuals employed as hourly-paid maintenance workers by defendants AIMCO Properties and NHP Management Company, seek a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).  In a previous order, I conditionally certified a class of "all individuals employed by defendants as maintenance technicians at any time since August 7, 2000"[1] so that plaintiffs could notify putative class members and seek opt-ins.  374 F.Supp.2d 196, 202 (D.D.C. 2005).  Plaintiffs have done so, understanding that their collective action can be fully certified only if the class members are "similarly situated" as required by FLSA.  Now pending before the court is defendants' motion to decertify [#202], asserting that plaintiffs cannot satisfy that requirement.  For the reasons that follow, I find the motion to be well taken.

--------

          [1]Specifically, the proposed class covered anyone employed as hourly-paid "Service Technicians" or "Maintenance Supervisors" or "Service Managers," or in "other job titles performing similar duties."  Am. Compl. ¶ 4.

**BACKGROUND**

Defendants own and operate over 1,700 apartment communities located throughout the nation, at which they have employed more than 10,500 maintenance technicians like the plaintiffs.  Those employees have been and are required to be "on call" outside of their regularly assigned work hours, in order to respond to tenant requests for service or repair.  The plaintiffs here, all maintenance technicians, assert two claims: (1) non-payment for overtime hours worked, and (2) non-payment for time "on-call."

An FLSA "collective action" may be prosecuted by an employee on his or her own behalf and on behalf of "other employees similarly situated."  29 U.S.C. § 216(b).  A collective action differs from a Rule 23 class action in two key respects. First, all FLSA plaintiffs must "opt-in" by consenting in writing to the court.  Id.  Second, FLSA collective actions are not subject to the numerosity, commonality, and typicality requirements of class actions under Rule 23.  Hunter v. Sprint Corp., 346 F.Supp.2d 113, 117 (D.D.C. 2004).  See also Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1105 (10th Cir. 2001) ("Congress clearly chose not to have the Rule 23 standards apply...and instead adopted the 'similarly situated' standard.'").

- 2 -

The FLSA does not define the term "similarly situated," id. at 1102, and courts have adopted several different approaches for making that determination.  The most common of these, the "ad hoc" approach,[2] calls for a two-step evaluation of "the distinct legal and factual similarities and differences between and among class members' legal claims."  374 F.Supp.2d at 200.  At the first step, the court may conditionally certify the class and permit plaintiffs to issue notice upon nothing more than a "modest factual showing sufficient to demonstrate that [putative class members] and potential plaintiffs together were victims of a common policy or plan that violated the law."  Id., quoting Hoffmann v. Sbarro, Inc., 982 F.Supp. 249, 261 (S.D.N.Y. 1997).  See also Mooney v. Aramco Services Co., 54 F.3d 1207, 1214 n.8. (5th Cir. 1995)(requiring at the first stage only "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination.")(emphasis added; internal citations omitted).  At the second step, however - usually triggered by a defense motion to decertify - the court must make a determination of whether the class members are actually similarly situated.  374 F.Supp.2d at 200.

---

[2]The Court of Appeals for the D.C. Circuit has not adopted this or any other approach.  The ad hoc approach has been used by other judges on this court, however.  See Hunter v. Sprint Corp., 346 F.Supp.2d 113 (D.D.C. 2004)(Bates, J.); Hyman v. First Union Corp., 982 F.Supp. 1 (D.D.C. 1997)(Lamberth, J.).

My previous ruling in this case adopted the ad-hoc approach and permitted plaintiffs to move past the first step. I found that "[t]he record as it now stands does not support a collective action on either of plaintiffs' theories." Id. at 201. Nevertheless, I saw "little prejudice to the defendant" in conditionally certifying the class and allowing plaintiffs to go forward with issuing notice. Id.

Notice was duly issued, and more than 1,100 putative class members filed opt-in papers, with 889 asserting "waiting-time" claims and 872 asserting "unpaid overtime" claims.[3] The expected defense motion to decertify has been filed and fully briefed. It is time to decide whether the plaintiffs really are similarly situated.

Plaintiffs no longer defend the class they first proposed. Instead, they propose two "subclasses": one for employees with waiting time claims, and another for employees with unpaid overtime claims. The proposed "waiting time subclass" has 115 members. It consists of plaintiffs who "were subject to the AIMCO policy that, while on call, they must respond in person within approximately 20 minutes to emergency tenant requests" and who "responded to more than 20 calls each week that they were on-call." Pls.' Opp. at 31. The "unpaid

---

[3]These numbers, calculated by defendants, are unchallenged by plaintiffs.

overtime subclass" has 378 members.[4]  The record does not disclose why so few of the 1,100-plus employees who opted in are included in the subclasses.

## ANALYSIS

There is no established standard of review for the second step of the ad hoc approach.  It is clear, however, that the second step must be "higher" than the first, Thiessen v. General Elec. Capital Corp., 996 F.Supp. 1071, 1080 (D. Kan. 1998), or "stricter," Smith v. Heartland Auto. Servs., Inc., 404 F.Supp. 2d 1144, 1149 (D. Minn. 2005).  Plaintiffs contend that the "touchstone" consideration is whether the case can be manageably adjudicated,[5] but most district courts at the second step have considered three factors: (1) the similarity - or disparity - of the factual and employment settings of the individual plaintiffs; (2) the defenses that appear to be individual to each plaintiff; and (3) procedural considerations and overall fairness.  Moss v. Crawford & Co., 201 F.R.D. 398,

---

[4]Plaintiffs initially filed 346 affidavits for their unpaid overtime subclass and later moved for leave to file additional affidavits in support of their proposed subclasses.  The motion [#207] will be **granted** as to the unpaid overtime subclass.  As the parties now agree, the motion as to the waiting time subclass is **moot.**

[5] In my previous ruling, I noted that it is "difficult to tease out any standard for decision out of these so-called ad hoc decisions," 374 F.Supp.2d. at 200, and it may be that "what is 'similarly situated' enough for collective action treatment under the FLSA is a matter for the sound discretion of trial courts, guided mostly by Rule 23(b)(3)-like considerations of manageability and efficiency." Id.

409 (W.D.Pa. 2000). <u>See also</u> <u>Thiessen</u>, 996 F.Supp. at 1080;
<u>Sharer v. Tandberg, Inc.</u>, Civ. No. 06-0626, 2007 WL 676220, *2
(E.D. Va. 2007); <u>Vaszlavik v. Storage Technology Corp.</u>, 175
F.R.D. 672, 678 (D.Colo. 1997). Manageability is an important
factor, but it cannot without more justify a finding that class
members are similarly situated.

During the first step review in this case, when "[t]he
record...[did] not support a collective action," 374 F.Supp.2d at
201, plaintiffs' "unpaid overtime" claim was supported only by
"anecdotes, a few e-mails from and to supervisors, and an
argument about the absence of AIMCO records." Their waiting time
claim had "even less record support." <u>Id.</u> The question, then,
is whether plaintiffs have improved the record enough to support
a finding that the members of their proposed class are indeed
similarly situated.

**(1) Unpaid Overtime Claim**

AIMCO Policy 203 requires nonexempt employees working
more than 40 hours "to be paid at an overtime rate." Defs.' Ex.
C. Although the company generally requires preapproval of most
overtime work, a second policy memorandum provides that overtime
"not approved in advance...still must be paid to the employee."
Defs.' Ex. E. Plaintiffs do not challenge the authenticity or
applicability of these documents. Plaintiffs' theory, however,
is that, notwithstanding its written policies, AIMCO's common
practice was not to pay overtime, and that this practice was the

- 6 -

natural and probable result of (1) the company's unrealistically low expectations for staffing, and (2) the company's policy of requiring preapproval for most overtime work.  AIMCO acknowledges that "particular managers" might have been "confused" by AIMCO's policies, but says that the evidence "indicates nothing more than isolated and aberrant practices rather than a common policy." Defs.' Mot. at 38-39.

The record consists of declarations and testimony of individual employees who say that they were not paid for overtime work.  That evidence, without more, does not demonstrate the existence of a common, company-wide practice of non-payment of overtime.  The e-mails and other management communications plaintiffs have placed on the record do not demonstrate the existence of a "nationwide illegal policy."  England v. New Century Financial Corp., 370 F.Supp.2d 504, 511 (M.D.La. 2005). They reflect "local policies of various managers located at different sites."  Id.

The e-mail from Stephen Ira, upon which plaintiffs rely heavily, is a telling example.  Ira is a company founder who, in 2001, e-mailed the vice-presidents and property managers within a single regional division (Southeast) ordering "no overtime period unless I personally approve it in advance of the time it is incurred."  Pls.' Ex. 34.  That e-mail, at least on its face, does not prohibit managers from paying employees who have already worked overtime.

- 7 -

Plaintiffs have made no effort to show how many, or
which, of the "unpaid overtime" class members were employed in
the Southeast region, at or after the time of this e-mail. The
case plaintiffs have presented for certification, indeed, makes
no attempt to show how region, or job title, or date of
employment and overtime worked (and unpaid) makes the opt-ins
"similarly situated." What the plaintiffs' "subclass" members
appear to have in common is that they actually assert a claim.
This amounts to certification by self-selection, ignoring
everyone to whom the alleged "common practice" was <u>not</u> applied.
Plaintiff's brief admits as much: "Whether other AIMCO employees
outside of the unpaid overtime subclass were not subject to the
AIMCO practices [of not paying overtime] is irrelevant to the
claims of this subclass." Pls.' Opp. at 12. Plaintiffs envision
a trial in which the jury hears "class-wide evidence" that AIMCO
"effectively required many maintenance employees to work unpaid
overtime responding to emergency calls." <u>Id.</u> at 13.[6] But what
of all the employees who <u>were</u> paid for overtime? According to
plaintiffs, they are "no longer relevant," <u>id.</u> at 12, but they
are highly relevant to the proposition that AIMCO did <u>not</u> have a

_____

[6]As defendants point out, the reliability of these
declarations is suspect. For example, AIMCO's records indicate
overtime payments made to 170 opt-ins who filed sworn affidavits
stating that they never received any overtime pay. Second Supp.
Decl. of Sherlyn Keiling, ¶ 3(g). In addition, many members of
the proposed subclass were dismissed for poor performance or
worked for less than the full 90-day probationary period. <u>Id.</u>
¶¶ 3(a), 3(f).

common practice of denying overtime compensation.  The fact that fewer than 400 out of a possible 10,500 maintenance workers (less than four percent) assert a claim for unpaid overtime tends to prove the absence of a company-wide practice.[7]  The 378 members were employed at at least 295 distinct properties in 41 states.  <u>See</u> Second Supp. Decl. of Sheryln Keiling ¶ 3(a).  There is no indication that the claims of the subclass members were concentrated in any particular region or part of the company.  Under AIMCO's decentralized management structure, these employees were subject to individualized decisions at different locations by different managers and supervisors, each of whom, in denying overtime compensation, would have been acting contrary to the company's formal policy.

Several courts have refused to certify collective actions where, as here, individual claims and defenses predominate.  <u>See, e.g.</u>, <u>Lusardi v. Xerox Corp.</u>, 118 F.R.D. 351, 370 (D.N.J. 1987), vacated in part and modified in part on other grounds by <u>Lusardi v. Xerox Corp.</u>, 122 F.R.D. 463 (D.N.J. 1988); <u>Brooks v. BellSouth Telecommunications, Inc.</u>, 164 F.R.D. 561, 569 (N.D. Al. 1995); <u>Bayles v. American Medical Response of Colorado</u>, 950 F.Supp. 1053, 1067 (D. Colo. 1996).  In many ways, this case

---

[7]Plaintiffs repeat the same circular argument about the waiting time class.  "AIMCO has argued strenuously that this written policy was not uniformly applied throughout the country.  Whether or not that claim is accurate, however, is now irrelevant."  Pls.' Opp. At 7, n.3 (internal citations omitted).

is similar to <u>Basco v. Wal-Mart Stores, Inc.</u>, 2004 WL 1497709
(E.D.La. 2004), in which the district court denied a motion for
certification of a class consisting of "any and all" Wal-Mart
employees in Louisiana who "[d]id not receive minimum or overtime
wages" due to a series of corporate practice designed to control
payroll costs.  The court stated:

> [P]laintiffs seek to make a corporate policy to keep
> employee wage costs low sufficient proof to justify the
> creation of a class of all Wal-Mart employees that have
> not been properly paid overtime in the last three
> years.  It is obvious from the discovery presented that
> this "policy" and its effects are neither homogeneous
> nor lend themselves to collective inquiry.  The effects
> of the policy as alleged are anecdotal, that is to say
> particularized.  Plaintiffs' own witnesses demonstrate
> that the "policy" was not even uniformly or
> systematically implemented at any given store.  While
> it is true that this "lesser" standard should not
> preclude certification, and "similarly situated" does
> not mean identically situated, plaintiffs have failed
> in their burden of proof to demonstrate identifiable
> facts or legal nexus that binds the claims so that
> hearing the cases together promotes judicial
> efficiency.

<u>Basco</u>, 2004 WL 1497709, at *7.  <u>See also</u> <u>England v. New Century
Financial Corp.</u>, 370 F.Supp.2d 504, 511 (M.D.La. 2005)("[I]f
liability is found at one location, this would not necessarily
require this Court to also find liability at another location.").

**(2) Waiting Time Subclass**

The waiting time subclass fares no better.  In order to
recover for such a claim under the FLSA, an individual plaintiff
must show that she was "engaged to wait" and not "waiting to be

engaged." <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 137 (1944).  In

my previous memorandum, I warned plaintiffs that

> [T]he personal situations that may or may not give rise
> to liability are so varied that the prospect of finding
> enough "similarly situated" workers to make a
> collective action worthwhile appears dim.  The
> plaintiffs have cited no case in which a waiting time
> claim was accorded collective action status, and I have
> found none.

374 F.Supp.2d at 201.  As with the unpaid overtime subclass,

nothing has changed except that plaintiffs have created a

narrower subclass, consisting, now, only of employees who "were

subject to the AIMCO policy that, while on call, they must

respond in person within approximately 20 minutes to emergency

tenant requests" and who "responded to more than 20 calls each

week that they were on-call," Pls.' Opp. at 31.[8]  Plaintiffs

argue that this subclass meets the "similarly situated" criteria

with respect to the "two primary factors for determining whether

waiting time should be paid: (1) the degree to which they were

restricted while on call; and (2) the frequency with which calls

were received."  <u>Id.</u>

Plaintiffs rely for this approach on <u>Renfro v. City of</u>

<u>Emporia, Kan.</u>, 948 F.2d 1529 (10th Cir. 1991), but that case is

---

[8]As defendants point out, there is reason to believe that
not every member of the proposed subclass was in fact required to
respond in person within 20 minutes to all tenant requests for
emergency service.  Defs.' Mot. at 23.  Although AIMCO's
"Benchmark" recommended such a response, it was not mandatory,
and the record reflects statements from many employees confirming
that they were able to respond to tenant requests by phone.

easily distinguished.    First, although the <u>Renfro</u> court did
indeed adjudicate waiting time claims for thirty-five emergency
workers, they were all employed by (and in) one city.   There were
no opt-ins, so that the court had no need even to address the
question of whether the plaintiffs were "similarly situated."
Second, the <u>Renfro</u> plaintiffs presented a far stronger claim that
they were "engaged to wait" than any plaintiff here.   Those
plaintiffs

> [C]ould not go out of town; they could not do simple things
> such as change their oil or work on their cars; they could
> not go to a movie or go out to dinner for fear of being
> called back; they could not be alone with their children
> unless they had a babysitter "on-call;" they could not drive
> anywhere with anyone when on-call (i.e., they must take
> separate cars in case of a callback); and, they were
> reluctant to participate in group activities for fear of
> being called away.

<u>Renfro</u>, 948 F.2d at 1532.   In contrast, individual plaintiffs in
this case acknowledge that they go to the movies, <u>see, e.g.,</u>
Rosario Decl. ¶ 8, eat dinner, <u>see, e.g.,</u> Dority Decl. ¶ 9, and
even sleep while on call, <u>see, e.g.,</u> Broadie Dep., Defs.' Second
Supp. App. Ex. 2 at 61, 78.

        Plaintiffs' two-factor approach to waiting time claims
is an incorrect statement of the law.   Waiting time claims
require one determination, whether "the restrictions placed on
the employee preclude using the time for personal pursuits."   29
C.F.R. § 553.221(d).   Plaintiffs' second factor - the frequency
with which calls were received - is one of several considerations
courts look to when making this determination.   The Ninth

Circuit, for example, has listed the following additional
factors:

> (1) whether there was an on-premises living
> requirement; (2) whether there were excessive
> geographical restrictions on employee's movements;
> (3) whether the frequency of calls was unduly
> restrictive; (4) whether a fixed time limit for
> response was unduly restrictive ; (5) whether the
> on-call employee could easily trade on-call
> responsibilities (6) whether use of a pager could ease
> restrictions; and (7) whether the employee had actually
> engaged in personal activities during call-in time.

Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers,
971 F.2d 347, 350 (9th Cir. 1992).  See also Pabst v. Oklahoma
Gas & Elec. Co., 228 F.3d 1128 (10th Cir. 2000)(considering the
number of calls, required response time, and ability to engage in
personal pursuits while on call).[9]  Plaintiffs have put forth no

---

[9]    Plaintiffs contend that whether employees engaged in a
variety of activities is "immaterial."  Pls.' Opp. at 38.  They
cite only one case for that proposition, Armour & Co. v. Wantock,
323 U.S. 126 (1944), in which the Court "held on-call time to be
compensable notwithstanding that the employees could sleep, play
cards, and participate in other amusements while waiting for
calls."  Pls.' Opp. at 38 (citing Armour, 323 U.S. at 128).
Plaintiffs fail to mention, however, that the employees in Armour
were firefighters, who were prohibited from leaving the fire
hall.  Armour, 323 U.S. at 127.  Given that there is no
allegation in this case of a common practice requiring employees
to stay on the premises while on call, plaintiffs' citation to
Armour is distinguishable.

evidence suggesting that their proposed class members are similarly situated with regard to these other factors, and the record as it stands suggests otherwise.  As with the proposed unpaid overtime subclass, the members of the waiting time subclass worked at a different facilities across the country. Indeed, the 115 putative class members worked at at least 91 different properties, located in 28 states.  Supp. Decl. of Sheryln Keiling ¶ 3(a).  The waiting time subclass cannot overcome the "disparate factual and employment settings of the individual plaintiffs" or "the various defenses available." Lusardi, 118 F.R.D. at 359.

* * * * *

For the foregoing reasons, defendants' motion to decertify [#202] is **granted**.  The Clerk is directed to schedule a status conference.

JAMES ROBERTSON
United States District Judge